WILLIAM E. FIORUCCI, Appellant, v. C. F. BRAUN & Co., a corporation, Appellee.

(*August* 22, 1961.)

LYNCH, J., sitting.

*Garry G. Greenstein* (of Wahl, Greenstein and Berkowitz) for Appellant.

*William Prickett, Jr.* (of Prickett, Prickett and Tybout) for Appellee.

Superior Court for New Castle County, No. 327, Civil Action, 1960.

LYNCH., J.:

The Industrial Accident Board was called upon to determine several factual issues in these proceedings, including these:

1. Had appellant physically recovered from the necessary operation for repair of the hernia he sustained while at work, so that he was, from a physical point of view, able to return to work and perform the duties incident to his employment?

2. Was appellant suffering from a psychological or psychosomatic condition arising from the injury and the resulting surgery, which was sufficient to disable him and so as to make him unable to return to work, and thus to have a claim for compensation because of this condition?

Some other issues, factual as well as legal, were raised; they will be referred to hereafter, as necessary to the opinion.

A rather full discussion of the testimony the Board heard is necessary because of the amount of the award, the findings of fact, as well as the absence of other findings of fact, and the language in the award. The Board's failure to make findings on all of the issues presented to the Board for its determination is particularly important, as will appear hereafter.

The post-operative psychosis or neurosis or psychological or surgical overlay, or psychosomatic condition—call it what you may—which appellant contends limits his ability to return to work has long been recognized by medical authors. In 1916 a monograph was published by a German psychiatrist, Dr. K. Kleist, which discussed the condition

and referred to it as a psychosis. A Dr. Milton M. Abeles refers to this article in a paper he wrote which is published in the *American Journal of Psychiatry*, March, 1938, Vol. 94, pages 1187-1203, entitled "Post-Operative Psychosis". Dr. Abeles observes at page 1188 that Dr. Kleist named the condition "Interval Psychosis" as he noted it frequently takes several days before "the onset of the psychosis" is recognized. Many medical works, such as *Modern Clinical Psychiatry*, Noyes and Kalk, (1958), pages 235-236 and *American Handbook of Psychiatry*, Chapter 60, by Ebaugh & Tiffany, pages 1230-1240, discuss the condition.

Courts have long recognized such psychological or psychiatric conditions as compensable, particularly if the condition follows a compensable injury and as a direct and natural result thereof. *Eaves v. Blaenclydach Colliery Co.*, [1909] 2 *K. B.* 73, 75 (C. A.). The Master of the Rolls in deciding the appeal under the English Workmen's Compensation Act, after alluding to the findings made by the Arbitrator that the injured man had had a complete physical recovery; that "the man honestly believes he is not able to do the work, and * * * he is not shamming or malingering" held, in reversing the award, that it is not sufficient to show that the physical mischief is at an end. It was stated on the appeal:

"* * *. The effects of an accident are at least twofold: they may be merely muscular effects * * * and there may also be, and frequently are, effects which you may call mental, or nervous, or hysterical, whichever is the proper word to use in respect to them. The effects of this second class, as a rule, arise directly from the accident from which the man suffered just as much as the muscular effects do, and it seems to me entirely a fallacy to say that a man's right to compensation ceases when the muscular mischief is ended, though the nervous or hysterical effects still remain. * *"

See also Larson, *Workmen's Compensation Law*, § 42.22, including cases cited in 1960 supplement, 5 Schneider, *Work-*

*men's Compensation,* pages 241 *et seq.,* § 1411; see also discussion in 99 *C. J. S.* Workmen's Compensation § 168b, pp. 553 *et seq.,* and 58 *Am. Jur.* Workmen's Compensation § 250, p. 752.

The evidence considered by the Board tends clearly to demonstrate that appellant was suffering such a psychological condition, psychosis or neurosis and that it would appear the Board failed to consider and make a finding respecting such issue. The Board might have ruled it would not recognize appellant's condition as compensable, although it did not, as will be discusseed later. Appellant was at least entitled to have his condition considered and determined, factually and as a matter of law.

### The Testimony Reviewed

Appellant, a journeyman pipefitter with 16 years experience, was working for C. F. Braun & Company, the employer, on January 28, 1957 at the Tidewater Refinery. His work included preparing and installing steel and iron pipe; the job entails a good deal of climbing and heavy lifting. A pipefitter must work with and bend the pipe, as well as install it; he must also load and unload it. It is physically strenuous work and requires that the pipefitter be in excellent physical condition (Tr. 10, 12, 22, 23)[1]. Appellant earned about $136 per week (Tr. 6). Appellant was putting a 90 degree bend in a one-half inch steel pipe, by placing the pipe in a vise and bending it manually with what is called a "hickey". As he was doing this he felt a severe pain in the lower left side of his groin. Because of this pain he did not bend any more pipe the rest of the day (Tr. 8). That evening, when taking a shower at home, he noticed a swelling below his groin. The pain persisted through the night. The next morning he notified his foreman of the pain and then went to first

---

[1]These are references to pages in the Transcript of the hearing before the Board.

aid. He was examined by doctors; his condition was diagnosed as a bilateral hernia (Tr. 12 & 13).

Appellant was operated on in the Providence Hospital, Washington, D. C., by Dr. Philip A. Caulfield on February 18, 1957. The operation revealed a small direct and indirect hernia on the right side, and a large direct hernia on the left side (Tr. 64).

Appellant's recovery from the operation was seemingly uneventful; he apparently had a complete physical recovery (Tr. 43, 45, 48, 51, 64, 65, 88 and 91)[2]. He made three routine post-operative visits to Dr. Caulfield, *i.e.* on March 1, March 8 and April 12 (Tr. 64), and a final visit was scheduled for May 6, 1957. Before that date, *i.e.* on May 1, 1957, appellant wrote (Tr. 65) Dr. Caulfield as follows:

"I am writing you this letter instead of making a trip to your office as per my appointment, May 6, as I have no means of transportation.

"You informed me in our telephone conversation of April 22 that you were turning in my papers for me to return to work. Dr., I want to explain how my injury happened. I had been working as a Steam Tracer for three months. A Steam Tracer's material requires ½", ¾" & 1" black pipes schedule 80 for steam pressure from 40 to 160 lbs. I asked my foreman if the Company had any pipe bending machines and the foreman informed me the C. F. Braun & Co. at Delaware City, Delaware, was furnishing only 'Hickeys' to bend the ½", ¾" & 1" black schedule 80 pipes. By bending the pipes as directed caused a strain on my entire system and on January 28, 1957, at 2:00 o'clock in the afternoon I suffered Bilateral Hernias and a

---

[2]This seems to be disputed by Dr. Lance who gave appellant medical care after he returned to his home in Kansas. His testimony is considered later. The dispute here is significant because the Board failed to make a finding as to whether appellant had or had not fully recovered from the physical aspects of his injury and the consequent surgery.

severe shock to my entire system. I still have pains, am weak & nervous and I am positive I cannot return to work & perform duties as I am required to do.

"Regardless of the outcome, I am not returning to work until I' m100% physically fit.

"Would you kindly inform me by mail or telephone your final decision in this matter. My telephone number is Appleton 7-4077."

Appellant had (Tr. 65) in the course of his three previous visits to Dr. Caulfield, advised him that he, appellant, was not returning to work, as Dr. Caulfield had directed, because appellant felt "he was not able to return to work". Dr. Caulfield nonetheless insisted appellant should return to work. Appellant stated to the doctor "he wasn't going back to work for a year" because "he didn't feel capable of going back to work * * *."

On receipt of the above quoted letter (Tr. 66) Dr. Caulfield telephoned appellant and—

"* * * I told him that I felt he ought to go back to work. And he asked me if I was familiar with the work as a steamfitter and I said I had a good general idea of what a steamfitter did and I felt that he was capable of going back to work[3] and I expected him to go back to work."

After the operation appellant walked with a cane for three months (Tr. 15); he testified he was unable to climb, run or go up and down stairs. These complaints might well be considered in the evaluation of appellant's condition.

---

[3]It is appropriate to here observe that Dr. Caulfield did not testify that he advised appellant it was necessary to come and see him. He only told him that "he was capable of going back to work", and he "should return to work". Dr. Caulfield's testimony shows he made no request for further examination. A comparison of this advice with the testimony of Dr. Lance and his professional observations—especially with respect to appellant's continuing complaints of pains and distress—makes the Board's failure to find if appellant has had complete physical recovery very important.

Dr. Caulfield testified he found no physical complications and that he saw no reason why appellant should not go back to work (Tr. 66). When asked why appellant did not want to go back to work, Dr. Caulfield merely stated "I don't know. I didn't have any term for it. He just didn't want to go back to work." (Tr. 75).

Dr. Caulfield showed (Tr. 68) an awareness of the psychological consequences of surgery (Tr. 68); he recognized a psychiatric problem could have been involved. Dr. Caulfield testified he has never in his 31 years of practice referred a patient to a psychiatrist because of a psychological overlay (Tr. 76). Dr. Caulfield's method of handling problems involving a patient's unconscious psychological reactions to injuries and surgery is to advise the patient to go back to work (Tr. 75)[4]. A consideration of what is to be found in the medical books cited above would have shown that appellant was demonstrating the usual symptoms associated with a post-operative neurosis or psychosis.

Dr. Caulfield conceded (Tr. 78) that he considered the May 6th visit as routine. He gave no testimony that he had a plan to examine appellant or for treating him for any psychological problem; he did not think appellant's problem was serious. Dr. Caulfield was unable to state whether appellant's reluctance to return to work was beyond conscious reasoning (Tr. 79), saying no more than—

----

[4]The doctor testified (Tr. 77-78) that appellant gave him no opportunity to consider if any psychological problem was involved, although he had previously testified (Tr. 74) he did not find "any psychological overlay" in appellant's case, although it was apparent appellant was exhibiting the symptoms usually found in such cases. See symptoms referred to in Dr. Abeles' article in 94 *Am. Journ., Psychiatry,* page 1188. Then, too, Dr. Caulfield had had much opportunity to observe these symptoms since appellant had been in his care for about three months prior to the proposed May 6th appointment and had been telling Dr. Caulfield he was not returning to work. Dr. Caulfield (Tr. 79) was clear that appellant was not a conscious malingerer; he didn't "know whether it [appellant's decision and conduct] is beyond his conscious reading or not."

"In my opinion he has made up his mind that he is not capable of going back to work. Now that is all I can say about it." (Tr. 79.)

Appellant left Hyattsville, Maryland in June, 1957 to go to live with his parents in Mulberry, Kansas.

Appellant testified at the hearing that he continued to have pain in the groin, and the pain sometimes radiates down into the legs (Tr. 19). If he attempts any labor, the pain grows worse (Tr. 19); this same pain persists and his condition has not improved.

Appellant consulted Dr. James Lance[5] at Arma, Kansas, on July 6, 1957.

---

[5]This doctor testified (Dep., pp. 5-7):

"Q. Did you at that time give him a physical examination, doctor? A. Yes, sir, I did.

"Q. What did that disclose? A. Well, at that time it disclosed healed surgical incisions in both inguinal regions, and this scar was very tender on the left side at the upper outer pole and the cord was also tender as it went into the scrotum.

\* \* \* \* \* \*

"Q. Have there been any changes in his complaints, or changes in his condition? A. No, there hasn't. He still has the same complaint he had originally.

"Q. When was the last time you saw Mr. Fiorucci? A. I saw him about three times this month—last time was this morning.

"Q. You had occasion to see him this morning—did you observe him and ask him what his complaints were at that time? A. Yes, his complaints were the same regarding the hernia complaints he had, but it was for a different reason I saw him—he had an abscessed wen on his back.

"Q. But you also examined him for the hernia he had? A. Yes.

"Q. Did you, from your examination and observation of Mr. Fiorucci, form an opinion as to this man's disability for the performance of ordinary manual labor as the result of the injury he gave you a history of in Delaware in January, 1957? A. Because of his continued complaints and symptoms it is my opinion he is permanently disabled as far as heavy manual labor or performing his duties as a journeyman pipefitter.

"Q. Doctor, I ask you what you base your opinion on in regard to the length and duration of the disability which you find in this man as the result of the hernias which he sustained in January, 1957? A. You mean why he has this disability?

"Q. That is right. A. I think it is probably due first because of a tight opening, not that the opening wasn't big enough to start with but it has a scar there where the cord pierces the fascia of the muscle at the upper outer pole and the ilio-inguinal nerve was involved in the surgical repair."

Dr. Lance, when he first saw appellant, advised him to make an attempt to return to work. Appellant rode a tractor for three or four hours, but late that night he felt such severe pain and nausea he was obliged to call Dr. Lance (Tr. 15, 20). Appellant continued his visits to Dr. Lance until shortly before the hearing before the Board. Appellant testified he is no longer able to perform strenuous physical work (Tr. 26, 27) and that he has not worked since the date of his injury (Tr. 34); he occasionally attempts to cut the lawn, but his pains force him to stop; he has never applied for work of any kind (Tr. 35) but plans to take any work if it is "something I can handle" (Tr. 102).

On December 4, 1959, and just shortly before the hearing before the Industrial Accident Board, appellant was examined by Dr. Charamella in Wilmington, who found the two bilateral hernia repairs which seemed to be well done (Tr. 43).

Dr. Charamella offered two possible explanations as to the reasons for the pain that appellant continues to suffer: (1) the possibility of nerve damage and/or (2) psychological involvement (Tr. 46). If there was a psychological involvement, Dr. Charamella felt it was probably not malingering, but was unconscious on appellant's part. If present, he felt it would be related to the injury (Tr. 47). Dr. Charamella's testimony was that it was very possible there was a functional overlay (another term for post-operative psychosis) but he felt it would require further study (Tr. 49, 50). He did not say definitely (Tr. 52) that if a surgeon would rule out organic cause, the condition would be a psychological phenomenon. Dr. Charamella's testimony seems to support that given by Dr. Lance, and as set forth *supra* in footnote 5.

Dr. Joseph Armenio, a general surgeon in Wilmington, Delaware, examined appellant in December, 1959, at the instance of the employer and he testified as a witness for the employer. I believe that the Board should have considered if the employer was bound by his testimony. It is stated in 32 *C. J. S.*

Evidence § 1040, p. 1104 *et seq.* that a party calling a witness vouches for the credibility of and is bound by his testimony. There are no reported cases in Delaware involving this rule. Dr. Armenio's testimony is uncontradicted and tends strongly to substantiate appellant's contentions.

The general tenor of Dr. Armenio's testimony was that appellant's problem was psychological, not physiological. "* * * it is partially psychosomatic and it is partially something that he involuntarily feels, I'm sure." (Tr. 85, 95, 96, 98, 99 and 100). Dr. Armenio found no neurological abnormality (Tr. 96); he found nothing organically wrong with appellant. (Tr. 92). Dr. Armenio stated appellant is not a malingerer (Tr. 95) and he testified that appellant *is just as much disabled in practical effect as though he had an organic disability* (Tr. 96). Dr. Armenio testified (Tr. 95, 96; 100, 101)—

"Q.   Doctor, if he feels these pains and discomforts and if he feels and thinks in his own mind that he is unable to work, then he is not being a malingerer, is he? In other words he is not being a faker or a fraud?   A.   No; no. I think he honestly is not being a fraud. He is misinterpreting what he is receiving.

"Q.   This complex and rather complicated state of mind which you characterize as being partially psychosomatic is a medical problem in itself, is it not?   A.   Yes.

"Q.   That is one frequently seen by physicians and one lying especially within the specialty of psychiatry, isn't it?   A.   Yes.

"Q.   Now if a person has the state of mind such as Mr. Fiorucci displays and which you have observed through your rather careful examination and questioning of him, that man is just as much disabled in practical effect as though he had an organic disability, isn't he?   A.   Yes.

"Q. And that again is a medical problem, is it not? or perhaps a medical-social-economic problem, if you want to state it more broadly? A. Yes, that would be better.

"Q. The cure or correction of such a problem is one which is within the realm of medical science, is it not? A. Yes.

"Q. Although medical science, like any other diseases and illnesses may not have a sure cure for it. Nothing else will cure it, I take it, but some type of medical or psychiatric treatment. A. Yes. He will also need possibly some surgery. Now this, I am speaking purely and simply in the sense that what you would want to try and do would be to knock out or anesthetize this area so he will get no further conscious stimuli, by use of Novocaine or something which would completely remove this. Again, as I say, this is purely trial. I wouldn't be able to guarantee anything."

The Chairman of the Board (Tr. 98-99) questioned Dr. Armenio:

"Q. Doctor, do you have a recommendation as to what should be done with this man at this time? A. It is most interesting to—actually it would have to be a team affair. I certainly would like to see what a psychiatrist would evaluate to either agree with my own interpretation or to add to or even change completely. I would certainly get an opinion first in that respect. Then the next step would be in conjunction with the psychiatrist, who would agree or disagree, would try urgently to anesthetize this abdominal wall with Novocaine and see what type of response we would get.

"Meanwhile we would certainly[6] have to coach Mr. Fiorucci on accepting all of these things with the idea in mind that he

---

[6]It is hard to comprehend why the Board, in the face of Dr. Armenio's testimony did not direct the employer to follow out Dr. Armenio's recommendations; it is equally unclear why the employer did not adopt these recommendations since this doctor was its expert and his testimony lent support to appellant's claim for disability on physical as well as psychological reasons.

will go back to work and should go back to work, and I think he will go back to work as soon as—it is going to be a matter of reassurance."

The foregoing discussion of the evidence heard by the Board amply demonstrates that the Board was aware that the issues for its determination included the extent of appellant's physical recovery as well as the psychological aspects resulting from his hernia brought out in the evidence presented. The Board made no finding on this physical phase of appellant's case; it did not make a finding on the psychological aspects of appellant's recovery. In short, the Board did not make any findings on either the physical aspects or psychological aspects of appellant's recovery from the hernia sustained in the course of appellant's performance of his work, as found by the Board.

Dr. Caulfield and Dr. Armenio—both of whom testified for the employer—gave considerable testimony tending to support appellant's contention of a psychological disturbance, as had Dr. Charamella, appellant's witness. There was no apparent dispute as to this condition; the employer's medical witnesses only differed in the methods to be used to help appellant recover so he can return to work. Dr. Caulfield had one proposal of how appellant could be cured, while Dr. Armenio made another proposal of treatment.

Appellant, as referred to *supra*, in footnote 5, proffered Dr. Lance's deposition. From this deposition it appears that appellant continued to complain (Dep. 5) of:

"* * * suffering from pain in both scars [of his operation] that radiated into his testes and also had pains in the lower part of his abdomen."

Dr. Lance's physical examination—

"* * * disclosed healed surgical incisions in both inguinal regions, and this scar was very tender on the left side at the

upper outer pole and the cord was also tender as it went into the scrotum."

Dr. Lance's explanation was it was—

"* * * due first because of a tight opening, not that the opening wasn't big enough to start with but it has a scar there where the cord pierces the fascia of the muscle at the upper outer pole and the ilioninguinal nerve was involved in the surgical repair."

Dr. Lance (Dep. 16) conceded on cross-examination the operation was "done very well".

Dr. Lance gave three reports, for medical and insurance purposes, of his observations and treatment of appellant. His report of January 22, 1959 (Dep. 19-20) is illustrative of the others as expressing Dr. Lance's conclusions; it is set out in full—

"'January 22, 1959. To whom it May concern: William E. Fiorucci, of Mulberry, R. R. 1, Kansas, single, age 50, occupation journeyman pipefitter.

"'While working at his occupation in the state of Delaware in January, 1957, patient sustained a bilateral inguinal hernia. On February 28, 1957, he underwent surgery for repair of both hernias in Washington, D. C. He was first seen here on July 6, 1957, because of persistent pain in the left operative site, with radiation of pain into the left testicle. He was treated conservatively and advised not to return to work until a year following his surgery.

"'Mr. Fiorucci has been seen a number of times since his first visit and has always complained of the abovementioned pain. At the present time he had pain in the left operative site, with radiation into the scrotum and into the lower abdomen. It is present all the time and made worse on coughing, sneezing, straining, brisk walking, riding, and is even present

on lying down. On examination pain is elicited at the point where the transplanted cord pierces the fascia at the upper outer pole of the surgical repair.

" 'Because of lack of improvement in, and the continued persistence of Mr. Fiorucci's disability from pain, he is 100 per cent disabled from performing his occupation as a journeyman pipefitter. Sincerely, Raymond W. Lance, M.D.' "

So much then for a review of the testimony submitted to the Board.

### The Award

The Board found as facts that appellant sustained a personal injury, arising out of and in the course of his employment, which required surgery, disabling appellant from his work from and including January 30, 1957 through April 27, 1957. The Board ruled, as a matter of law, that appellant was at fault in not keeping an appointment with Dr. Caulfield in May of 1957, and cited Title 19 *Del. C.* §§ 2321, 2322, 2323 and 2324[7], and further ruled, as a matter of law, "that any disability from which" appellant "may be suffering is the result of his failure to cooperate and accept medical services in May of 1957." It is to be observed that the record is wholly silent as to employer having proffered any medical services at that time and appellant's refusal to accept any such proffered medical services. The Board's award directed appellant be paid "compensation * * * from January 30, 1957 through April 27, 1957". The Board did not expressly find on either of the principal questions presented.

It may be possible to argue—although without conviction—that the Board implicitly answered the first question by its award, covering physical disability for the period from January 30, 1957 through April 27, 1957, but it very clearly

---

[7]An examination of these cited sections of law quickly reveals their inapplicability to the facts and legal conclusions reached by the Board.

appears that the Board totally ignored the issue of whether appellant was suffering from continued physical difficulties and a psychological condition or disturbance, as has been considered and recognized without any dispute, by employer's witnesses, particularly Dr. Armenio.

A further difficulty is the Board's attempted legal substantiation of its award by concluding that appellant "was at fault in not keeping an appointment with Dr. Caulfield in May of 1957" and that any disability suffered by claimant "is the result of his failure to cooperate and accept medical services in May of 1957." There is nothing in the record to substantiate the legal conclusion. Dr. Caulfield had concluded before May of 1957 that appellant had complete physical recovery and that appellant should return to work; he did not testify he had plans to examine or to give any further treatment to appellant on the May 6th visit. Dr. Caulfield only continued to insist that appellant should return to work,—undoubtedly as part of Dr. Caulfield's method of treatment of appellant's psychosis or neurosis. See Dr. Armenio's testimony, *supra* at page 641.

I, therefore, cannot comprehend the Board's reasoning, fixing on appellant's failure to go to see Dr. Caulfield on May 6, 1957 as the reason to limit its award of compensation to appellant. Dr. Armenio's testimony of what he observed of appellant's condition and his recommendation of how the case should be handled should have been considered; at least it was reason for the Board to make an award for continuing temporary disability, pending the effectuation of Dr. Armenio's recommendations to the Board as to how best to handle appellant's case. The Board expressly recognized that claimant sustained a compensable injury and that he suffered a resulting physical disability. It sought to fix the cause of appellant's continuing disability on his failure to keep the appointment to visit Dr. Caulfield on May 6, 1957, as set up by the doctor; and the Board legally concluded that this de-

cision on appellant's part constituted a failure to cooperate and accept medical service.

Just how the Board could arrive at this conclusion is difficult to comprehend in light of Dr. Caulfield's testimony (Tr. 78) that he regarded appellant's proposed visit on May 6, 1957 as merely routine and that he had no plan for treating appellant for any psychological problem, or gave testimony he wanted to examine him further, as well as the testimony given by Dr. Armenio.

Title 19 *Del. C.* § 2343(a) and (b) provides that an employee's refusal to submit himself *for examination* shall deprive him of his right to compensation, but there is nothing in the record which would justify the application of this provision of the law as a reason to limit an award to appellant; nor is there any basis for applying the provisions of Title 19 *Del. C.* § 2353, since there is no testimony whatsoever that appellant refused "reasonable surgical, medical, and hospital services * * * tendered to him by his employer." On the contrary, Dr. Armenio's testimony—on behalf of employer—indicates that appellant is in need of further "surgical [and] medical services" and no showing is made that the employer tendered such medical services, or a refusal thereof.

In light of this testimony I am constrained to rule that the Board's legal conclusion for limiting the amount in the award it made to appellant is not supported by any testimony and is not justified as a matter of law. I can only view it as arbitrary and without legal justification.

A timely appeal was taken and the grounds of appeal are as follows:

(a) That the Board found appellant was at fault in not keeping an appointment with a physician in May of 1957. Such fact, if true, is immaterial.

(b) The said Board found that any disability on appellant's part extending beyond April 27, 1957 was the result of his failure to cooperate and accept medical service in May of 1957. Such finding is not supported by any competent evidence.

(c) In light of the evidence, the award must be taken as a rejection of the concept of disability founded upon non-organic causes; *i.e.* psychological or psychosomatic disability resulting from an industrial accident as defined in the Workmen's Compensation Statute.

## The Law

The U. S. Supreme Court held in *Securities and Exchange Commission v. Chenery Corp.*, 1943, 318 *U. S.* 80, 88, 63 *S. Ct.* 454, 459, 87 *L. Ed.* 626, that—

"* * * where the correctness of the lower court's decision depends upon a determination of fact which only a jury could make but which has not been made, the appellate court cannot take the place of the jury[8]. Like considerations govern review of administrative orders. If an order is valid only as * * * [a] judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment * * *, an appellate court cannot intrude upon the domain which

---

[8]The failure of a trial court to make a finding on a determinative factual issue constitutes reversible error. In *Bell v. Midland Nat. Life Ins. Co., S.D.*, 102 *N. W.* 2d 322, 327, the South Dakota Supreme Court noted that the trial court had made no finding on an issue of fact involving the scope and extent of appellant's employment, and ruled:—

"A failure to make a finding on a disputed material issue requires a reversal of a judgment. * * *"

In *Hartley v. Eagle Ins. Co.*, 222 *N. Y.* 178, 118 *N. E.* 622, 625, 3 *A. L. R.* 1379, the New York Court of Appeals held that where it appears that no finding was made upon a crucial question of fact in a case, the judgment cannot be allowed to stand. Other cases applying this rule are *First State Bank of Mountain Lake v. C. E. Stevens Land Co.*, 119 *Minn.* 209, 137 *N. W.* 1101, 1104; *Barry v. Sparks*, 306 *Mass.* 80, 27 *N.E.* 2d 728, 128 *A.L.R.* 983; and *Hitchcock v. Kennison*, 95 *Vt.* 327, 115 *A.* 156, 158.

Congress has exclusively entrusted to an administrative agency."

See also *Securities and Exchange Commission v. Chenery Corp.*, 1947, 332 *U. S.* 194, 195-197, 67 *S. Ct.* 1575, 1577, 1760, 91 *L. Ed.* 1995.

State Court decisions holding that administrative agencies are required to make findings on issues presented at the administration hearing are numerous, and the following cited cases are but a few of those to be found: *Hamilton v. Unemployment Compensation Bd. of Review*, 1956, 181 *Pa. Super.* 113, 124 *A.* 2d 681, 684-685, citing *In re Myers Unemployment Compensation*, 164 *Pa. Super.* 150, 152, 63 *A.* 2d 371, 373; and *Reddick et al. v. Scott et al.*, 1950, 217 *Ark.* 38, 228 *S. W.* 2d 1008, 1010, in which the Arkansas Supreme Court stated:

"* * * Where an administrative body is empowered to make findings of fact it is not the province of the courts to discharge that function merely because the administrative agency has not acted. * * *"

After considering the agency's failure to decide the fact question the Arkansas Court concluded:

"* * * It is not the function of this court to decide such fact questions in the first instance."

The Arkansas Supreme Court then proceeded to reverse the court below—

"* * * *with instructions to remand the cause to the Board of Review for findings of fact upon the issues that are still undecided* * * *." (Emphasis supplied.)

In *Application of Plainfield-Union Water Co.*, 11 *N. J.* 382, 94 *A.* 2d 673, 679, the New Jersey Supreme Court stated:

"The orderly functioning of the process of review requires that the ground upon which the administrative agency acted be 'clearly disclosed and adequately sustained.' * * *"
The Court proceeded to hold the findings of the particular administrative agency did not satisfy the prescribed standard and reversed the agency's determination.

The principle has been applied to cases involving review of awards by Workmen's Compensation Boards, 58 *Am. Jur.* Workmen's Compensation, §§ 463-465, pp. 874-875. In an annotation to be found in 146 *A. L. R.* 123, 197, the Annotator, after reviewing the authorities, makes this statement:

"* * * it may be laid down as a general rule * * * that where there is a non compliance by a compensation tribunal with the requirements of express findings of fact in support of its award, the award will be reversed * * * and the cause remanded * * * in order that it may conform to the requirement, * * *."

The Annotator suggests, 146 *A. L. R.* at page 201, that:

"The reason in support of the rule requiring the reversal of an administrative award for lack of the requisite express findings of fact is that it is the exclusive function of the compensation authorities to weigh and consider the testimony and make reasonable deductions therefrom, while the reviewing court's function is to determine whether there is sufficient evidence to support the findings, and whether the law has been properly applied."

The Workmen's Compensation Law of this State, Title 19 *Del. C.* Chapter 21, contemplates the Industrial Accident Board make findings of fact in the first instance, as is to be seen from a study of 19 *Del. C.* § 2345. It is there also specifically provided, that in the event the parties cannot reach an agreement in regard to compensation, then the Board is to be notified,—

"* * * and the Board shall thereupon * * * hear and determine the matter in accordance with the facts and the law, *and state its conclusion of fact and rulings of law.*" (Emphasis supplied.)

Further evidence of the statutory scheme of placing in the Board the power to determine causes arising under the law is to be seen in 19 *Del. C.* § 2347, involving reviews of agreements or awards, where it is again provided that upon—

"* * * such review, the Board may make an award * * * *and shall state its conclusions of facts and rulings of law.* * * *" (Emphasis supplied.)

The power and jurisdiction of this Court in the review of appeals from the Board is to be found in 19 *Del. C.* § 2350(b), where it is expressly provided that this Court shall determine the cause "from the record". No power is vested in this Court to make findings when there has been a failure on the part of the Board to do so. Our Supreme Court (1947) recognized the existence of the rule in *Le Tourneau v. Consolidated Fisheries Co.*, 4 *Terry* 540, 550, 51 *A.* 2d 862, 867, but did not apply it to the facts there presented.

In light of the legal principles herein set forth and discussed, this cause is reversed and remanded, *Carey v. Bryan & Rollins*, 1954, 9 *Terry* 395, 402, 105 *A.* 2d 201, 204, to the Industrial Accident Board with instructions to proceed, according to the provisions of Title 19 *Del. C.* § 2350, and in particular to determine all the issues of fact in this cause, including appellant's physical condition and post-operative neurosis or psychosis, if any, and to announce appropriate conclusions of law, and to make an award as the facts and law may justify.

An order may be presented, incorporating the holding of this opinion and also providing that a certified copy of this opinion and order is to be sent to the Industrial Accident Board so that it can proceed as herein directed.