Harry C. HUDSON, Jr., Petitioner, Appellee,

v.

E. I. DuPONT DE NEMOURS & COMPANY, Inc., Defendant, Appellant.

Superior Court of Delaware.

Sussex.

May 27, 1968.

Jackson W. Raysor, Tunnell & Raysor, Georgetown, for appellee.

W. B. DeRiemer, Wilmington, for appellant.

## OPINION

O'HORA, Judge.

This is an appeal from the findings and award of the Industrial Accident Board ("the Board"). The facts are complicated, and by necessity must be set out at some length.

In 1959, Harry C. Hudson ("the claimant") was hired by E. I. DuPont De Nemours & Company ("DuPont") as a carpenter. In 1961, the claimant fell on the

icy steps of his home and was treated for back injury, an injury which was not a compensable injury under the Workmen's Compensation Act.

From the time of the 1961 fall until October 9, 1964, the claimant experienced no trouble with his back that prevented him from working. On October 9, 1964, the claimant and three fellow employees were hoisting plywood to the second or third floor of a building, by fastening the plywood sheets in a rope sling, and by hoisting the rope hand over hand to the level on which they were working. In the process of performing this job the claimant's foot became entangled in the rope, causing him to fall backwards. After his fall the claimant complained that his back was injured.

Almost immediately after this "rope" incident claimant was examined by Dr. George H. Henning, a medical consultant for DuPont. Dr. Henning, after a complete examination, found a mild back strain, but concluded that otherwise nothing was wrong. The claimant was placed on light work for one and a half weeks.

Two weeks after the "rope" incident, on October 22, 1964, the claimant and other employees were sliding a door buck into a low wagon. In the process of picking up the door buck and putting it on the wagon, back pains struck claimant. Within a few hours of the "door buck" incident the claimant was examined by Dr. Marcus D. Stephanides in Salisbury, Maryland, who found a "mild lumbo-sacral strain". The claimant was again placed on light work.

On October 21, 1964, the day before the "door buck" incident, claimant received notice of layoff, and on November 4, 1964, was formally laid off. This job termination was unrelated to any injuries suffered by claimant.

Claimant testified that after his layoff he requested further medical assistance

from Dr. Stephanides but was refused, presumably because of the layoff. The claimant then consulted an attorney who requested that DuPont provide further medical attention. DuPont complied with the request, and the claimant was seen again by Dr. Henning. Dr. Henning found no abnormality or pathology. Claimant, through his attorney, then gave notice to DuPont that a third physician, Dr. Theodore Strange, was to be consulted by him.

Dr. Strange examined the claimant on December 22, 1964 and concluded that Hudson had a disc syndrome in his lower back. However, in light of a negative myelogram[1] Dr. Strange did not perform surgery, but instead used conservative treatment and traction. The claimant's hospitalization was from January 29 through February 22, 1965.

Subsequent to his hospitalization claimant experienced two falling incidents. A "hospital" incident occurred on the day of his discharge when the claimant's knee "gave way" and he fell to the floor. A "lawn" incident occurred sometime between February and April, 1965, when the claimant fell in his yard at home and experienced back pain.

On April 25, 1965, the claimant was again admitted to the Memorial Hospital as Dr. Strange's patient. A myelogram at this time indicated a probable disc protrusion at the L4–5 interspace and at L5–S1, two specific areas of claimant's lower back. Consequently, surgery was performed at L5–S1 and a large amount of degenerated protruding disc material removed. The claimant was discharged on May 20, 1965 and was practically pain free. Dr. Strange's advice to the claimant at this time was to take only light work which would involve no heavy lifting, pushing or pulling.

On July 16, 1965, a petition was filed with the Industrial Accident Board seeking compensation, and DuPont denied liability. A

1. A myelogram is an x-ray of the spinal cord, made after injection of a contrast medium into the subarachnoid space.

Blakiston's New Gould Medical Dictionary (2nd Ed. 1956).

hearing before the Board was scheduled for November 19, 1965 and all parties were present. The hearing was discontinued, with Board approval, because the parties indicated they had arrived at a settlement. However, during the ensuing nine months no settlement was actually reached. In August, 1966, claimant's counsel gave notice that no settlement had been reached and requested another hearing before the Board.

Meanwhile, and after the first Board hearing was discontinued, the claimant tried unsuccessfully to secure a job involving light work. He finally obtained a job with James Julian Construction Co. ("Julian") as a truck driver, in May, 1966, at a rate of pay lower than that paid by DuPont. He drove a dump truck, acted as a flagman, and moved sawhorses for detour signs. There is no evidence that the claimant had back pain at the time that he began working for Julian.

In August, 1966, two incidents occurred after which the claimant's back trouble became worse. In mid August claimant was resting on a beach chair, and when he attempted to rise, experienced such pain that he needed assistance. Two weeks after the "beach" incident the claimant was lifting and moving detour signs on his job, after which the back pain continually grew worse. The back pains became so intense that the claimant was forced to resign from the Julian employment.

For reasons that will later be apparent, the period of time from October 4, 1964 (marked by the incidents at DuPont) until the end of August, 1966 (marked by the detour sign incident) will be referred to as "Phase I". The period beginning after the detour sign incident until May 31, 1967 will be referred to as "Phase II".

On the day he resigned from employment with Julian, the claimant consulted his family physician, Dr. Charles Parnell-King, who referred him to Dr. Livio Olmedo. There is no evidence that claimant notified DuPont that he was utilizing the services of Drs. Parnell-King and Olmedo at that time.

Dr. Olmedo admitted the claimant to the hospital on December 6, 1966. A myelogram indicated a possible defect at L4–5 interspace on the left side, and surgery was performed at this site. A large amount of degenerative tissue was removed. Dr. Olmedo treated the claimant post-operatively, prescribed physical therapy to reduce the muscle spasm, and expressed the opinion that the claimant might be able to return to light work in June.

In February, 1967, the claimant notified his attorney, who in turn promptly notified DuPont, that claimant was utilizing the services of Drs. Parnell-King and Olmedo.

A hearing before the Board was held on March 13 and May 31, 1967. The Board found, inter alia, that the "rope" and "door buck" incidents of October, 1964, caused the claimant's back injury. Moreover, the Board awarded (1) total disability compensation of $50.00 per week payable from November 4, 1964 to April, 1966; (2) partial disability compensation of $48.00 per week payable from April, 1966 through August 29, 1966; (3) total disability compensation of $50.00 per week payable from August 30, 1966 to May 31, 1967; (4) permanent partial disability compensation of $50.00 per week payable for 75 weeks for 25% loss of use of the back from May 31, 1967; (5) costs of surgical, medical and hospital services, medicine and supplies; and (6) medical witness fees.

■ DuPont challenges the Board's finding that a compensable injury was caused by the "rope" and "door buck" incidents in October, 1964, and the awards premised upon this finding. Findings of the Board will not be disturbed on appeal if they are supported by substantial evidence. Craig v. Synvar Corp., Del.Super., 233 A.2d 161 (Super.Ct.1967). The precise question here is whether or not the record from below contains substantial evidence that the October, 1964 incidents caused the claimant's back injuries.

The principal evidence tending to show the causal relation relied upon by claimant is Dr. Strange's testimony. Although Dr. Strange did not examine the claimant until two months after the October, 1964 incidents, he testified that "from the very day that I first saw him [I felt that] he had a disc syndrome". When asked whether he attributed this disc syndrome to any particular cause, Dr. Strange answered:

"A. Well, in all probability he had degenerative changes in his disc when he had this lifting episode of October, 1964. This was an aggravation of a preexisting condition. * * *

Q. Had you known about the fall—the various falls that he sustained, would that have had any partial effect on your determination or opinion?

A. They all add up. They all contribute something to the degenerative changes in his disc.

Q. You didn't assign it to any one cause then?

A. Not in this case, no. He was at work. I assume he was working without a backache, and this was the one thing that seemed to make it worse. So from a symptomatic standpoint if what he tells me is so, the back was not giving him trouble until the lifting episode. But pathologically speaking he had problems with his disc, I'm sure, before this lifting."

The claimant's explanation to Dr. Strange, that his back gave him no trouble until October, 1964, must be accepted here. His unimpeached testimony is to that effect and there is nothing in the record from which this Court could conclude that the Board was not justified in accepting this evidence as true.

Dr. Strange was then questioned as to the possible causal effect of the claimant's falls in the hospital and in his yard. He answered that those falls would have an "aggravated effect". When asked whether the "giving way" of the claimant's knee was consistent with a disc syndrome, Dr. Strange testified that the two conditions were consistent.

In the course of the hearing Dr. Strange reiterated that the claimant had a degenerative condition, but conceded that the disc syndrome could have been caused by an activity as commonplace as picking up a match at home, and that conceivably the claimant could have gone on without any trouble.

Moreover, Dr. Strange testified that although he did not examine the claimant until two months after the "rope" and "door buck" incidents, if he had examined a patient having the same symptoms as those recounted by the claimant to Dr. Stephanides, his diagnosis would include a possible disc pathology. In other words, Dr. Strange's diagnosis would have differed from the diagnosis of Drs. Henning and Stephanides.

Finally, when questioned again as to the cause of what he diagnosed as to claimant's disc syndrome, Dr. Strange testified as follows:

"Q. Then the precipitating factor, Doctor, would not have been his living?

A. No, his living is the cause of the degenerative changes, then he goes along until he does something that makes his back hurt, lifting or a jump or fall or something.

Q. That is what I asked you. What in your opinion is the precipitating factor that caused this disc syndrome or disc pathology at this time?

A. His lifting episode of October, '64."

The Dr. Strange testimony tends to support a factual sequence of events. The claimant had a degenerative disc condition which could lead to a disc pathology if some trauma aggravated the preexisting

condition. Although the 1961 fall on the icy steps might have been an aggravating or "precipitating" factor, it was not, the claimant having had no trouble with his back between 1961 and October, 1964. He experienced pain only after the October, 1964, incidents. Dr. Strange examined the claimant two months after the October incidents and diagnosed his condition as a disc syndrome. If Dr. Strange had examined a patient having the claimant's symptoms, he would still have diagnosed a possible disc syndrome. A conclusion that the October, 1964 incidents caused a disc syndrome then follows. The claimant's subsequent falls in the hospital and in his yard, being consistent with a disc syndrome, the Board could have reasonably concluded that the syndrome probably caused those falls, and not the converse.

■ Claimant's particular type of injury was compensable. The fact that claimant suffered from a preexisting physical defect will not preclude compensation if employment conditions caused a sudden and violent acceleration and deterioration of the defect. General Motors Corp. v. McNemar, Del., 202 A.2d 803 (1964); General Motors Corp. v. Huester, 242 A.2d 314, Super. Ct. opinion dated April 30, 1968. The evidence here suffices to support the necessary, though unarticulated, conclusion that employment conditions caused a sudden and violent acceleration of claimant's defect, i. e., degenerative disc. Before October, 1964, (except for the 1961 fall) the claimant had no trouble with his back. After the October, 1964 incidents his back pains became so severe as to necessitate surgery seven months later.

■ The evidence is also sufficient to answer DuPont's further contention that the claimant suffered no "injury" within the meaning of the statute, because he suffered no "violence to the physical structure of the body". On the contrary the Board was entitled to find that he did suffer such injury, the October, 1964 incidents being of sufficient magnitude to support the medical conclusion that it was "the" precipitating factor.

■ DuPont next challenges the award of total disability compensation from November 4, 1964 to April, 1966. It urges the Board erred as a matter of law because the "beach" incident and the "detour sign" incident were individually or together an intervening cause involving new symptoms and resulting disabilities. The Court has difficulty with this contention. Both the "beach" and "detour sign" incidents occurred in August, 1966, and thus cannot be the cause of disabilities which occurred beforehand. Further the record shows that the claimant was unable to find work until May, 1966, when he began to work for Julian. Thus, the award during this period, with one exception, is proper. The exception is that there is nothing in the record to sustain an April, 1966 date. Claimant began work on May 1, 1966. Total disability should therefore have been awarded to May 1, 1966. Partial disability should have been payable from May 1, 1966 instead of from April, 1966.

DuPont's contentions as to the existence of an "intervening" cause are applicable, however, to Phase II, since the claimant's condition worsened after August, 1966, the beginning of Phase II.

■ DuPont's contentions are best understood in light of the applicable law. A subsequent injury is compensable only if it follows as a direct and natural result of the primary compensable injury. 1 Larson, Workmen's Compensation Law, § 13.-12; Hartford Fire Insurance Company Group v. Beeler, 244 F.Supp. 188 (E.D. Tenn.1965); See Fiorucci v. C. F. Braun & Co., 4 Storey 79, 173 A.2d 635 (Super. Ct.1961). If the subsequent injury is attributable to the claimant's own negligence or fault, the chain of causation is broken and the subsequent injury is not compensable. (See authorities cited immediately above).

DuPont first contends that the "beach" incident was due to the claimant's fault rather than to his prior compensable injury. The record does not support this suggestion. The claimant had a degenerative disc condition which tended to cause increased pain. When he was lying on the beach chair, he did nothing more than attempt to arise. In so doing he experienced such pain that he required assistance. This alone is no evidence of negligent behavior on claimant's part. Moreover, the pain suffered was consistent with a continuous degeneration of the disc. Hence the Board could have found that claimant's discomfort on the beach was caused by his preexisting condition, aggravated by the October, 1964 incidents. It was not compelled to find that the claimant's negligence caused him to meet with an injury on the beach. See Hartford Fire Insurance Company Group v. Beeler, (supra).

The Board did err, however, in its consideration of the "detour sign" incident of August, 1966. After claimant's first disc operation he was advised by Dr. Strange to look for light work. The claimant took a job in May, 1966 as a truck driver. One of the claimant's duties was that of moving detour signs. Apropos this duty the claimant testified:

"They had some things made out of word that they set on an angle sort of like detours traffic over, and we picked those up and moved them. From that day on it really got bad, the pain in my back."

When asked again whether he injured himself while lifting those signs, the claimant said:

"A. Yes, I could tell there was more pain.

Q. The same kind of pain that you had before?

A. Before the operation, yes."

Although the Board made no such express finding, it must have concluded that the pain resulting from the "beach" incident, as well as all Phase II physical injuries, were caused by the primary compensable injury. An examination of the record, however, discloses no proof, particularly medical, to sustain such a finding. Compare Hartford Fire Insurance Company Group v. Beeler, (supra), where such proof existed. The only relevant medical testimony is that of Dr. Olmedo, who took no position as to any possible causal link between the "beach" or "detour sign" incidents and claimant's prior or subsequent disabilities.

It is true, as DuPont suggests, that the claimant's testimony permits an inference that the "detour sign" incident was the result of the claimant's negligence, and thus was an independent cause of his Phase II injuries. But the absence of medical testimony on this point precludes such a holding as a matter of law. A more complete record is necessary. Consequently the Board must hear testimony on this issue on remand, and make independent findings. See 101 C.J.S. Workmen's Compensation § 788, pp. 28–29.

DuPont next attacks the award for 25% loss of use of the back, on grounds that such loss of use was caused neither by the primary injury (the October, 1964 incidents), nor the subsequent injury (the "detour sign" incident and Phase II injuries). The contention as to the primary injury has been answered. The answer to the contention that the subsequent injury was an independent cause of Phase II injuries must be answered at least initially by the Board on remand. If the Board finds that the "detour sign" incident was not caused by the primary compensable injury, then it must make a new finding of the extent of loss of use of the back as of August 29, 1966 before the "detour sign" incident occurred.

In any event, as DuPont contends, the award cannot be based upon a finding of 25% loss of use. The only relevant evidence was Dr. Olmedo's testimony that the claimant suffered 20% loss of use. Conse-

quently, 20% loss of use is the maximum permissible limit if the Board finds in the claimant's favor upon remand.

DuPont contends also, that the Board erred in awarding that part of medical, hospital and surgical bills, which pertain to claimant's Phase II injuries. DuPont says that because the claimant violated the provisions of 19 Del.C. § 2323, by failing to notify it, (1) of his intention to utilize the services of Drs. Parnell-King and Olmedo, and (2) of the fact that the aid of those physicians was being employed, he failed to fulfill a condition precedent for recovering medical expenses. The claimant argues that the notice requirement can be dispensed with if lack of notice does not prejudice the employer.

The Court does not reach the issue of whether notice is mandatory. That issue does not arise if the Board finds that claimant's Phase II injuries were caused by his own negligence in lifting the detour signs. In such an event the Court's holding at this stage would be merely advisory, and made in an incomplete factual setting. The Court notes, for example, the absence of any factual finding as to whether notice was or was not given to DuPont. The Board should have made such a finding and must do so on remand. The legal significance of lack of notice, if any, can then be considered in the full factual circumstance.

DuPont's final contention is that the Board erred in awarding medical witness fees, because of the alleged lack of causal connection between the detour sign incident and the Phase II injuries.

 The language of the relevant statute, 19 Del.C. § 2322(e) provides that:

"The fees of medical witnesses testifying at hearings before the Industrial Accident Board in behalf of an injured employee shall be taxed as a cost to the employer or his insurance carrier in the event the injured employee receives an award."

Here the injured employee has received a valid award for injuries that occurred during Phase I. Thus the employer, DuPont, cannot contest liability for fees of medical witnesses whose services were performed during that period. However, two medical witnesses performed services during Phase II. Does § 2322(e) allow fees for medical witnesses whose testimony covers possibly non-compensable periods if the claimant procures any award, or can only those witnesses whose testimony pertains to a compensable period receive a § 2322(e) fee?

The Court believes the statute supports the first view. The statute states that if the injured employee receives "an award", the employer must pay fees for "medical witnesses" who testify at a hearing before the Board. There is no language which would distinguish between medical witnesses who performed services during the period of the award and those who perform services afterwards. The legislature might well have made such a distinction but did not. The injured employee in this case received "an award" and it follows, therefore, that the employer will be responsible for all reasonable medical witness fees under § 2322(e). The opposite conclusion would result in a claimant being forced to make an important decision as to which medical witnesses he should rely upon in situations in which the question of compensation, as here, is an extremely close one. Such a holding would seem to be at odds with the entire concept of Workmen's Compensation legislation, absent specific legislative direction to the contrary.

For the reasons set forth, the Court draws the following conclusions:

(1) The awards payable from November, 1964 until August 29, 1966, should be affirmed, except that:

a) the total disability compensation award beginning November 4, 1964, should be modified so as to extend to May 1, 1966, and

b) the partial disability compensation award payable from April, 1966, should be modified so as to be payable from May 1, 1966.

(2) The awards payable from August 29, 1966, should be reversed, and the case remanded for rehearing and a determination of whether the Phase II injuries were caused by the primary compensable injury or by an intervening cause. If the Phase II injuries are found to be compensable, the permanent partial disability award for 25% loss of use of the back must be modified to the amount payable for 20% loss of use. If the Phase II injuries are not compensable, a new determination of loss of use as of August 29, 1966, must be made, in no case to exceed 20% loss of use of the back, and an appropriate award entered.

(3) The award of hospital, medical and surgical bills should be affirmed as to the part payable to August 29, 1966. The remainder of the award should be reversed. If on remand phase II injuries are found to be compensable, the Board should find whether the claimant complied with the notice provisions of § 2323, and whether the claimant should recover the remainder of the award for medical expenses.

(4) The award of medical witness fees should be affirmed.

It is so ordered.